UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ERNESTO ROSADO-SERRANO,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | 13-cv-1900 (MEL) |

**OPINION AND ORDER**

### I.   PROCEDURAL HISTORY

Ernesto Rosado-Serrano ("plaintiff" or "claimant") was born on April 27, 1964, and has a 6th grade education. (Tr. 22; 393.) He has prior work experience as a Telephone Line Installer and a Heavy Truck Driver. (Tr. 22; 56.) On June 30, 2010, claimant filed an application for Social Security disability insurance benefits, alleging that on May 25, 2009 he became unable to work due to a disabling condition. (Tr. 393.) His date last insured was September 30, 2013. (Tr. 15.) Claimant's application was denied initially and upon reconsideration. (Tr. 13.) He requested a hearing before an Administrative Law Judge ("ALJ"). He waived his right to appear and testify at the hearing held on October 11, 2012, but was represented by counsel at the hearing. Id. A vocational expert ("VE") testified by telephone. Id. The ALJ rendered a decision on October 12, 2012, finding that claimant was not disabled because jobs exist in significant numbers in the national economy that claimant can perform. (Tr. 19.) The Appeals Council denied plaintiff's request for review on October 24, 2013. (Tr. 1.) Therefore, the ALJ's opinion became the final decision of the Commissioner of Social Security (the "Commissioner"). Id.

On June 19, 2012, plaintiff filed a complaint seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g) and 5 U.S.C. § 706, alleging that defendant's finding that plaintiff was not disabled was not based on substantial evidence. ECF No. 1, ¶¶ 2, 6. Plaintiff and defendant have submitted supporting memoranda of law. ECF Nos. 18, 19.

## II. STANDARD OF REVIEW

The Social Security Act provides that "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion." Irlanda-Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). The Commissioner's decision must be upheld if the court determines that substantial evidence supports the ALJ's findings, even if a different conclusion would have been reached upon review of the evidence *de novo*. Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981). The Commissioner's fact findings are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

An individual is deemed disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claims for disability benefits are evaluated according to a five-step sequential process. 20 C.F.R. § 404.1520 (2012); Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999). If it is determined that the claimant is not disabled at any step in the evaluation process, then the analysis will not proceed to the next step. At step five of

the sequential process, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[1] combined with his age, education, and work experience, allows him to perform any other work that is available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that there is work in the national economy that the claimant can perform, then disability benefits are denied. 20 C.F.R. § 404.1520(g). Under steps one through four, the plaintiff has the burden to prove that he cannot return to his former job because of his impairment or combination of impairments. Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (per curiam). Once he has carried that burden, the Commissioner then has the burden under step five of the sequential process "to prove the existence of other jobs in the national economy that the plaintiff can perform." Id.

### III.  MEDICAL EVIDENCE SUMMARY

#### A. Physical Health Evidence

Claimant has a history of cardiac problems and has been diagnosed with severe dilated non-ischemic cardiomyopathy and atrial fibrillation. (Tr. 269.) He was hospitalized from July 6, 2007 through July 20, 2007 for uncontrolled atrial fibrillation. (Tr. 105.) An echocardiogram study performed on July 7, 2007 revealed a "severely reduced" left ventricular ejection fraction of 10-20%.[2] (Tr. 97; 98.) In August 2007 claimant underwent cardiac catheterization.[3] (Tr. 94; 105.) Claimant has been prescribed oral medication for his heart condition, including Coumadin, Metroprolol, Enalapril, Digoxin, and Warfarin. (Tr. 135; 507; 560).

---

[1] An individual's RFC is the most that he can do in a work setting despite the limitations imposed by his mental and physical impairments. 20 C.F.R. § 404.1545(a)(1).

[2] Left ventricular ejection fraction "is one of the major tests used to evaluate the severity of cardiomyopathy." Charles T. Hall, Soc. Sec. Disab. Pract. § 7:46 (2014). "An 'ejection fraction' is the measurement of the percentage of blood leaving someone's heart each time it contracts." Benson v. Colvin, Civil Action No. 11-11935-JCB, 2013 WL 1328084, at *8 n. 5 (D. Mass. March 29, 2013). An ejection fraction of 65% is considered normal; "[a] person with an ejection fraction of 30% or below will feel quite weak," and "[a]n ejection fraction of less than 20% is considered ground for consideration of a heart transplant." Charles T. Hall, Soc. Sec. Disab. Pract. § 7:46 (2014).

[3] At some point prior to September 28, 2009, claimant had a pacemaker implanted. (Tr. 153; 118.) However, a review of the medical evidence in the record that the parties and the ALJ have cited does not reveal the actual date of implantation.

On January 18, 2010 claimant was admitted to the Mayagüez Medical Center due to complaints of chest pain, dizziness, and increased perspiration. (Tr. 115.) A chest x-ray showed "[i]ncreased interstitial markings involving the right lung base," no pleural effusion, no pneumothorax, and that his pacemaker was in place. (Tr. 118.) An echocardiogram report dated July 5, 2010 revealed "adequate left ventricular contractility" with a left ventricular ejection fraction of 55-60%, that claimant's pacemaker was in place, and "mild mitral and tricuspid regurgitations." (Tr. 556.)

Claimant was evaluated by consultant internist Dr. Karen V. Stewart ("Dr. Stewart") on November 5, 2010. (Tr. 560-70.) Dr. Stewart noted claimant's history of atrial fibrillation and that he had a pacemaker implanted. (Tr. 560.) She indicated that his heart had an irregular rhythm, but no gallops or murmurs. (Tr. 561.) She gave him a "guarded" prognosis and in the "assessment" section of her report she wrote: "Case of a 46 y/o man with Atrial fibrillation, HBP and PVD that makes him limited to sustained standing, sitting, bending, kneeling and pushing." (Tr. 562.) A chest x-ray Dr. Stewart ordered revealed "no acute disease." (Tr. 570.)

On April 25, 2011 state agency consultant Dr. Iván Acosta ("Dr. Acosta") completed an RFC assessment of claimant. (Tr. 574-84.) Dr. Acosta indicated that claimant could occasionally lift up to 20 pounds; frequently lift 10 pounds; sit, stand or walk about 6 hours in an 8-hour workday; and engage in unlimited pushing and pulling. (Tr. 577.) He opined that claimant could frequently engage in balancing, stooping, kneeling, and crouching; occasionally climb ramps or stairs or crawl; and never climb ladders, ropes, or scaffolds. (Tr. 578.) Dr. Acosta stated that claimant's "symptoms seem out of proportion to the evidence [are] probably related to an associated depressive reaction." (Tr. 581.)

An echocardiogram report dated May 16, 2011 indicates that claimant's pacemaker was in place and he had "decreased systolic function" with a left ventricular systolic ejection fraction of 25-30%. (Tr. 256.) The interpreting physician noted: "There is global hypokinesis. The aortic valve is calcified. There is mild aortic regurgitation. There is mild to moderate tricuspid regurgitation (183 cm/s)." Id.

On July 29, 2011, Dr. Juan F. Rodríguez-Acosta ("Dr. Rodríguez-Acosta"), claimant's treating cardiologist since August 23, 2007, completed an RFC questionnaire, indicating that the symptoms and limitations reported in it were applicable beginning in early 2007. (Tr. 259-62.) Dr. Rodríguez-Acosta assessed a guarded prognosis. (Tr. 260.) He noted that claimant could not walk a city block without rest and indicated that claimant could sit for 1 hour at a time before needing to get up, could stand for 10 minutes at a time, and would sometimes need to take unscheduled breaks during an 8-hour working shift, requiring 30 to 40 minutes of rest before returning to work. Id. Dr. Rodríguez-Acosta checked off boxes to indicate that claimant could lift less than 10 pounds on occasion in an 8-hour working day and could never lift more than 10 pounds, twist, stoop, bend, crouch, climb latters, or climb stairs during an 8-hour working day. (Tr. 261.) In Dr. Rodríguez-Acosta's estimate, claimant would likely be absent from work more than four days per month as a result of claimant's impairments or treatment. (Tr. 262.)

### B.     Mental Health Evidence

Claimant sought psychiatric treatment from Dr. Alberto Rodríguez-Robles ("Dr. Rodríguez-Robles") on February 15, 2011, due to feelings of depression, problems concentrating, irritability, and anxiety. (Tr. 265.) Dr. Rodríguez-Robles diagnosed claimant with major depressive disorder and noted that claimant's depressed mood and anxiety began 20 years prior to the consultation. Id.

Dr. Rodríguez-Robles completed a disability determination form on April 8, 2012, based on an evaluation that took place on April 3, 2012. (Tr. 278.) Dr. Rodríguez-Robles stated that claimant had "little attention and concentration" and noted that claimant could not "follow the sequence," became very anxious, and that he did not complete tasks. (Tr. 273-76.) He indicated that claimant needs help to complete daily tasks and that claimant did "not tolerate stress" and had "a fear of dying from heart problems." (Tr. 277.) Dr. Rodríguez-Robles also indicated that plaintiff had panic attacks three to four times a week, lasting 10-15 minutes, during which claimant "becomes afraid, gets palpitations, and feels like he is going to die." Id. Dr. Rodríguez-Robles's disability determination form indicates that claimant did not go out alone due to fear of the panic attacks. Id. On April 8, 2012 Dr. Rodríguez-Robles also completed a mental health RFC assessment, indicating that claimant's mental health condition imposed marked limitations in claimant's understanding and memory, sustained concentration and persistence, social functioning, and adaptation. (Tr. 282-84.)

## IV.   LEGAL ANALYSIS

Plaintiff argues that the ALJ ignored substantial evidence regarding his functional limitations and failed to give good reasons for giving "little weight" to the opinions of his treating cardiologist, Dr. Rodríguez-Acosta, and treating psychiatrist, Dr. Rodríguez-Robles. ECF No. 18, at 12. The ALJ rendered an RFC assessment that conflicted with the opinions of claimant's treating physicians and formulated a hypothetical question to the VE based on the abilities and limitations included in this RFC assessment. (Tr. 18; 38.) Thus, it is plaintiff's position that because the hypothetical question to the VE did not account for all of his functional limitations, the VE's testimony that claimant could perform the job of Wire Preparation Machine Tender or Electronic Worker (Tr. 12.) does not support the determination at step five of the

sequential process that claimant was not disabled between May 25, 2009 and September 30, 2013 (the "disability insurance period"). ECF No. 18, at 18-19.

Pursuant to the Social Security regulations, the ALJ evaluates all medical opinions he receives "[r]egardless of its source," unless a treating physician's opinion is given controlling weight. 20 C.F.R. § 404.1527(d) (2012). "Generally, the ALJ gives 'more weight to the opinions from the claimant's treating physicians, because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments.'" Berríos Vélez v. Barnhart, 402 F.Supp.2d 386, 391 (D.P.R. 2005) (citing 20 C.F.R. § 404.1527(d)(2)). To be given controlling weight, the treating physician's opinion must be "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] record.'" Polanco-Quiñones v. Astrue, 477 Fed. Appx. 745, 746 (1st Cir. 2012) (quoting 20 C.F.R. § 404.1527(d)(2)). The ALJ, however, is not always required to give controlling weight to the opinions of treating physicians. Barrientos v. Sec'y of Health & Human Servs., 820 F.2d 1, 2-3 (1st Cir. 1987); Rivera-Tufino v. Comm'r of Soc. Sec., 731 F. Supp. 2d 210, 216 (D.P.R. 2010). Rather, the ALJ can give less weight to a treating physician's opinion, but must "give good reasons in [his] notice of determination or decision for the weight [given to the] treating source's opinion." Rodríguez v. Colvin, Civ. No. 12-1546(SEC), 2014 WL 1309964 (D.P.R. March 31, 2014) (citing 20 C.F.R. § 404.1527(c)(2); and Soto- Cedeño v. Astrue, 380 Fed. App'x 1, 4 (1st Cir. 2010) (per curiam); see also Pagán-Figueroa v. Comm'r of Soc. Sec., 623 F. Supp. 2d 206, 210-211 (D.P.R. 2009) (citing Carrasco v. Comm'r of Soc. Sec., 528 F. Supp. 2d 17, 25 (D.P.R. 2007)).

### A. Physical Health RFC Assessment

The ALJ determined that for the disability insurance period, claimant had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that he needs to alternate positions every two hours. (Tr. 18.) In making this determination, the ALJ gave "little weight" to Dr. Rodríguez-Acosta's RFC assessment, explaining that "the medical evidence fails to show that the claimant's cardiac condition has deteriorated to the point that he could not engage in even sedentary type of exertion."[4] (Tr. 21.) However, the ALJ assessed that claimant could do more than just sedentary work, as light work includes jobs that require "a good deal of walking or standing" and "involves lifting no more than 20 pounds at a time with frequent lifting or carrying or objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Even accepting the ALJ's conclusion that the medical evidence does not support a finding that claimant's condition is so severe that he cannot engage in sedentary work, additional evidence is necessary to sustain his conclusion that claimant is capable of frequent walking and standing, lifting up to 20 pounds at a time, and frequently lifting or carrying objects weighing up to 10 pounds.

In reaching the modified light work RFC determination, the ALJ relied on the opinion of state agency consultant Dr. Acosta. (Tr. 21.) As a rationale for his agreement with Dr. Acosta, the ALJ stated that "[t]he record fails to show worsening in claimant's condition." Id. However, Dr. Acosta completed his RFC assessment on April 25, 2011—that is, prior to the May 16, 2011 echocardiogram, which demonstrates that claimant had "decreased systolic function" with a left ventricular ejection fraction of 25-30%. Particularly in light of the ALJ's explanation that he accepted Dr. Acosta's assessment because the record does not reflect a worsening of claimant's

---

[4] Under the Social Security Administration regulations, "[s]endentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). While "a sedentary job is defined as one which involves sitting," they may involve occasional walking and standing. Id.

cardiac condition, the ALJ's reliance on Dr. Acosta is problematic because the record contains objective medical evidence that claimant's condition worsened subsequent to the assessment.

Claimant's treating cardiologist Dr. Rodríguez-Acosta rendered his assessment after the May 16, 2011 echocardiogram. The ALJ did take note of the results of this echocardiogram, but reasoned that it did not support Dr. Rodríguez-Acosta's "restricted" RFC assessment, stating:

> The record does not contain a recent echocardiogram study showing that the claimant's ejection fraction as remained severely decreased. There was only one occasion after the placement of the pacemaker when the claimant had an ejection fraction of 25-30%. The medical record does not contain evidence after that showing this type of severity.

Id. However, neither the ALJ's decision nor the parties in this case have cited or referred to a more recent echocardiogram study in the medical record. Thus, there was also no evidence before the ALJ that claimant's ejection fraction *improved* between May 16, 2011 and the date of the ALJ's decision.

The ALJ appears to have concluded that the lack of an additional echocardiogram study after May 16, 2011 undermines Dr. Rodríguez-Acosta's opinion as to what tasks claimant could and could not perform in a work setting throughout the disability insurance period. However, it is far from self-evident that the lack of additional evidence regarding claimant's ejection fraction translates to the ability to perform light work, if permitted to change positions every two hours, and the ALJ did not adequately explain this conclusion. The ALJ did note that Dr. Rodríguez-Acosta's "most recent treatment notes . . . show a controlled hypertensive condition." (Tr. 21.) The latest treatment note from Dr. Rodríguez-Acosta in the medical record is dated September 1, 2012 and lists claimant's medications, diagnoses, and a brief summary of the course of his cardiac illness. (Tr. 290-91.) It is not clear, however, how this treatment note contradicts his July 29, 2011 physical RFC assessment, which also accounted for claimant's medications, diagnoses, and

9

cardiac history. (Tr. 259-62.) The September 1, 2012 treatment note recounts much of the same information as the July 29, 2011 assessment and contains no evidence suggesting an improvement in claimant's condition that might support the ALJ's decision to set aside Dr. Rodríguez-Acosta's conclusions regarding claimant's work-related limitations in favor of adopting Dr. Acosta's less-restrictive assessment of his cardiac condition.

## B. Mental Health RFC Assessment

With regard to claimant's mental condition, the ALJ assessed that claimant "has a severe mental impairment, but not to the extent that he cannot engage in simple tasks on a sustained basis." (Tr. 21.) The ALJ's primary explanation for giving "little weight" to the mental RFC assessment complete by claimant's treating psychiatrist, Dr. Rodríguez-Robles, was that "no other treating physician reported similar findings." Id. However, a review of the evidence the ALJ cited in support of this assertion reveals that the "other treating physician[s]," Dr. Stewart and Dr. Rodríguez-Acosta, are specialists in internal medicine and cardiology, respectively—not mental health. (Tr. 21; 561.) Dr. Stewart found that claimant's general appearance was "alert and oriented," "well-groomed," and had "[a]dequate thought content and idea communication" during his evaluation on November 5, 2010. (Tr. 561.) However, not only does her report explicitly indicate that she was performing a physical examination rather than a mental one, her findings regarding claimant's general appearance on that date are not necessarily inconsistent with Dr. Rodríguez-Robles's assessment that claimant has work-related impairments in his understanding and memory, sustained concentration and persistence, social functioning, and adaptation. Dr. Rodríguez-Robles was the only mental health professional to examine claimant. It is true that the medical record does not contain another opinion corroborating Dr. Rodríguez-

Robles's findings, but given that the record contains no other mental health assessment this is not a sufficient basis for discarding Dr. Rodríguez-Robles's findings.

The ALJ also indicated that he found Dr. Rodríguez-Robles's April 8, 2012, findings that the claimant was "logic [*sic*], coherent, and fully oriented and presented adequate recent and remote memory skills and superficial judgment" to be inconsistent with the "level of severity" reported in his mental RFC assessment. (Tr. 21.) While Dr. Rodríguez-Robles did note that claimant was "[o]riented x3" during the evaluation, had "superficial judgement [*sic*]," and was "logical and coherent," Dr. Rodríguez-Robles also made numerous findings within the April 8, 2012 psychiatric medical report substantiating the marked limitations he found with regard to claimant's understanding and memory, sustained concentration and persistence, social functioning, and adaptation. (Tr. 273-74.) Dr. Rodríguez-Robles expressly found that claimant had "poor memory." (Tr. 273.) While Dr. Rodríguez-Robles noted that claimant's recent and remote memory was "OK," as to his immediate memory Dr. Rodríguez-Robles stated that claimant "[could not] remember the numbers in reverse order and he only remember[ed] one thing out of five." (Tr. 275.) Similarly, as to claimant's short-term memory Dr. Rodríguez-Robles expressed that claimant "remember[ed] two words out of five." Id. The finding that claimant had the ability to appropriately recall recent and remote events during the April 3, 2012 evaluation does not necessarily undermine Dr. Rodríguez-Robles's conclusions that he was markedly limited in the ability to "remember locations and work-like procedures," "understand and remember very short and simple instructions," and "understand and remember detailed instructions," as Rodríguez-Robles's findings with regard to claimant's immediate and short-term memory support these limitations. Dr. Rodríguez-Robles also found that claimant had "[p]oor attention and concentration." (Tr. 273.) Indeed, it is conceivable that claimant gave the

impression that he was oriented, logical, and coherent, but nevertheless exhibited limitations in sustained attention and concentration, such that he would experience problems carrying out instructions in the work place and performing activities within a schedule. Dr. Rodríguez-Robles explicitly noted that claimant was "easily distracted," "[did] not complete tasks," and "need[ed] help for daily tasks." (Tr. 276-77.) With regard to claimant's social functioning, Dr. Rodríguez-Robles indicated that claimant was "always isolated" and stated that he "[did] not like to go out and he cannot stay where there are many people." (Tr. 274.) As to claimant's adaptation, Dr. Rodríguez-Robles noted that claimant "[did] not go out alone" due to fear of panic attacks, which he experienced three or four times a week. (Tr. 277.) Viewed in their totality Dr. Rodríguez-Robles's detailed findings are consistent with the limitations he found in his mental RFC assessment; the findings that the ALJ referred to as "inconsistent" with Dr. Rodríguez-Robles's assessment do not warrant the "little weight" given to his opinion and the resultant omission of the limitations from the ALJ's RFC determination and hypothetical question to the VE.

## V.  CONCLUSION

In reaching an RFC determination regarding claimant's physical abilities, the ALJ relied on state agency consultant Dr. Acosta, whose assessment that claimant could engage in light work is not supported by substantial evidence in the record.[5] In doing so, he failed to provide good reasons for discrediting the contradictory assessment from claimant's treating cardiologist,

---

[5] The ALJ interpreted consultant internist Dr. Stewart's assessment that claimant was "limited to sustained standing, sitting, bending, stepping, kneeling, and pushing," as meaning that claimant has limitations in these areas. (Tr. 21.) In other words, the ALJ read Dr. Stewart's assessment to mean that claimant was limited "with regard to" sustained standing, sitting, bending, stepping, kneeling, and pushing, not that he can only perform these activities, as a plain language reading of her assessment might imply. Given the context of Dr. Stewart's sentence, the ALJ's reading of her assessment was appropriate, as taken literally it would mean that because of claimant's heart condition he must engage in these 6 activities on a sustained basis. This would be particularly irrational because there is no indication that Dr. Stewart's assessment is limited to what claimant can and cannot do in the workplace, but rather applies to his capabilities in general. Such a reading would essentially mean that he cannot do anything else aside from these 6 activities, including rest or take breaks from the activities Dr. Stewart enumerated.

Dr. Rodríguez-Acosta. See Polanco-Quiñones, 477 Fed. Appx. at 746. Similarly, the ALJ rejected the mental RFC assessment from claimant's treating psychiatrist, Dr. Rodríguez-Robles, but lacked an adequate basis for doing so. Although the ALJ was not required to give the treating physicians' opinions controlling weight if they were not well-supported or were inconsistent with other substantial evidence in the record, neither of those rationales is applicable in this case. Id. Therefore, the Commissioner's decision is hereby **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 24th day of March, 2015.

s/ Marcos E. López  
United States Magistrate Judge
